IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBERT J. BALDING,<br><br>                      Plaintiff,<br><br>v.<br><br>SUNBELT STEEL TEXAS, INC.;<br>SUNBELT STEEL TEXAS, LLC;<br>RELIANCE STEEL & ALUMINUM CO.;<br>DOES 1 through 50, inclusive,<br><br>                      Defendants. | **MEMORANDUM DECISION AND<br>ORDER DENYING MOTION TO<br>RECONSIDER IN PART AND<br>GRANTING IN PART**<br><br>Case No. 2:14-cv-00090<br><br>Judge Clark Waddoups |

Plaintiff Robert J. Balding moves the court, pursuant to Federal Rules of Civil Procedure 52, 56, 59 and 60, to vacate the summary judgment entered against him and in favor of defendants on May 16, 2016. (Dkt. No. 89.)  Balding requests that the court reconsider the matter, reevaluate the legal analysis, and allow him to submit additional evidentiary support. Defendants Sunbelt Steel Texas, Inc., Sunbelt Steel Texas, LLC  (collectively "Sunbelt") and Reliance Steel & Aluminum Co. ("Reliance") oppose the motion, arguing that relief is not available under Rules 52 and 56, and that Balding does not meet the requirements for relief under either Rule 59(e) or Rule 60(b).[1]  The court denies the motion as to Reliance on all claims; denies the motion as to Sunbelt on the contract and quantum meruit claims; denies the motion as to Sunbelt on the ADA discrimination and failure to accommodate claims; grants reconsideration

---

[1] The court finds that oral argument would not materially assist the court in deciding the issues presented, so the court issues this order based on the transcript of the summary judgment motion hearing and on the written briefs and supporting materials.

of the claims against Sunbelt for breach of the FMLA and for ADA retaliation and vacates its order granting summary judgment to Sunbelt on those claims; and vacates the clerk's judgment entered in favor of the Sunbelt defendants.

## BACKGROUND

Balding was hired to sell steel for Sunbelt in 2009. He alleges that his employment agreement was for $30,000 annual base salary and 1 ½ percent commission of his "total gross sales." In 2010, Sunbelt increased his salary to $40,000. It is disputed whether Sunbelt told Balding that the increase was in lieu of commissions. Sunbelt gave Balding further increases in his salary: $45,000 in April 2011, $52,000 in January 2012, and $60,000 in May 2012. Over this same period, Sunbelt paid Balding $23,250 in bonuses based on the company's overall performance. Balding was not paid commissions for any period.

During 2013, Balding suffered from various medical issues, including an anxiety/panic attack on November 20, 2013. Upon the recommendation of his doctor, Balding requested that he be allowed to take time off from work. It is undisputed that Sunbelt told Balding he could take time off and that he did take time off from work. It is disputed whether he requested vacation time or FMLA leave. On November 26, 2013, while Balding was on leave, one of Balding's customers inquired about the status of an order it expected to be delivered that day. Upon review of the inquiry, Sunbelt discovered that notwithstanding that the order was not yet entered into Sunbelt's system, Balding had promised the customer on November 21, 2013 that the order was "in process," that he was "rushing this through," and that the "dock date" would be "three days." Within several hours of reviewing the emails, investigating the status of the order in the company's computer system, and talking to Balding, Sunbelt terminated his employment.

Balding asserted four causes action against Sunbelt and Reliance:  (1) breach of his employment agreement by wrongfully terminating him and failing to pay him commissions; (2) unjust enrichment (quantum meruit); (3) violation of his rights under the Family And Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654; and (4) violation of his rights under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213. (*Am. Compl.*, Dkt. No. 30.) After extensive briefing and a lengthy oral argument, the court granted summary judgment in favor of defendants, dismissing all counts. The court provided a detailed explanation for its ruling on the record. (*Hr'g Tr.* 39-44, 50-51, 83-93, 98; Dkt. No. 86.)  A Memorandum Decision and Order granting Summary Judgment was entered on April 22, 2015, (Dkt. No. 85), and the clerk entered final judgment against Balding on May 16, 2016. (Dkt. No. 88.)

## ANALYSIS

The Tenth Circuit has recently set out the requirements for a motion to reconsider once judgment has been entered:

> A Rule 59(e) motion may be granted only if the movant establishes: (a) an intervening change in controlling law, (b) the availability of new evidence, or (c) the need to correct clear error or prevent manifest injustice. *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995). Similarly, relief under Rule 60(b) "is extraordinary and may only be granted in exceptional circumstances." *Amoco Oil Co. v. EPA*, 231 F.3d 694, 697 (10th Cir. 2000) (quoting *Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co*., 909 F.2d 1437, 1440 (10th Cir. 1990)).

*Callahan v. Commun. Graphics, Inc.*, No. 16-5011, 2016 U.S. App. LEXIS 13315, at *11-12 (10th Cir. July 21, 2016).

Balding does not argue that there has been an intervening change in controlling law. He does attempt to supplement the record with the declaration of his physician offered to provide an expert opinion to support that Balding had a qualifying medical condition that had a limiting effect on his ability to perform his work, an opinion for which there was no support in the record

at the time summary judgment was entered.[2] Importantly, the declaration is not newly available evidence. Balding testified by deposition that this same doctor had advised him to take time off work and that he had requested time off based on this doctor's recommendation.  The doctor confirms these facts in the proffered declaration.[3] (Dkt. No. 89-1.)  Accordingly, the court concludes that Balding has not established a legally sufficient basis to now present and rely upon the delayed declaration of his physician to support his claims.

Finally, Balding argues that the court committed clear error by failing to construe the facts in a "light most favorable to the non-moving party." (*Mot. to Recons.* 6, citing  *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 538 (10th Cir. 2014); Dkt. No. 89.)  As support, Balding submits 18 pages of essentially the same facts submitted in opposition to the motion for summary judgment and which were thoroughly explored at oral argument. Balding simply reargues the same facts that the court previously considered and found to be inadequate to sustain his burden of going forward, particularly as to his "joint" employer/enterprise theory claims against defendant Reliance, Sunbelt's parent "umbrella" corporation. Accordingly, the court denies Balding's motion to reconsider his claims against Reliance. Nevertheless, as to the claims against Sunbelt, the court accepts its responsibility to again review the facts and consider whether under the required standard that they be viewed in a light most favorable to him as the non-moving party they would be sufficient to sustain a jury verdict in Balding's favor on any of the four causes of action. It is important to observe that beyond the conclusory assertion that the court has failed to view the facts in a light most favorable to Balding, Balding does not present in

---

[2] The court did question Balding's counsel about the lack of such support at the hearing, but the lack of support was not the basis for the court's decision.

[3] This lately produced physician's declaration contains an almost identical reproduction of the language in both Mr. Balding's amended complaint (*Am. Compl.* ¶¶ 40-42, Dkt. No. 30) and in Balding's declaration. (*Balding Decl.* ¶¶ 28-30, Dkt. No. 72-1.)

detail any facts that he believes the court failed to properly construe in his favor. Thus the court has been left with the burden of itself reviewing the supporting evidence to determine upon reexamination whether they would support a verdict in Balding's favor. That reexamination supports the following conclusions.[4]

### 1. Breach of Contract

To successfully oppose a motion for summary judgment on the breach of contract claim, Balding must come forward with evidence from which a jury could find that each of the following elements have been satisfied:  (1) a contract (express written, oral or implied) existed between the parties, (2) performance by the party seeking recovery or excused performance, (3) breach of contract by the other party, and (4) damages. *Bair v. Axiom Design, LLC*, 2001 UT 20 ¶ 13 (Utah 2001).  (*Mem. in Opp'n to Sunbelt's Mot. for Summ. J.* 56, Dkt. No. 71.) Balding's principal claim under this cause of action is that Sunbelt breached his employment agreement by failing to pay him commissions. The determinative issue is whether Balding has presented sufficient evidence to create a material issue of fact on the first element. No party raises serious questions about whether, at this stage of the case, Balding can satisfy the other requirements.  As to the first element, it is undisputed that Balding and Sunbelt entered into an employment agreement. There is also evidence from which a jury could find that initially, Balding's agreed upon compensation was a base salary of $30,000 annually plus a commission of 1 ½ percent of "total gross sales."  It is disputed whether the commission was to be based on all accounts or limited to new accounts.  Viewing the facts most favorably to Balding that the commission was to be based on all accounts, the evidence would support that total sales of $248,364 through the

---

[4] Because the court agrees with defendants that Rules 52, 56, and 60 are not appropriate bases for relief in this case, the following is based upon a clear error analysis under Rule 59(e).

end of 2009 would have provided a commission of $3,725.[5] (*Decl. of M. Kowalski, Sr.* ¶ 8, Ex. 2; Dkt. Nos. 62, 62-2).

The fact that Balding's initial contract may have entitled him to a commission of $3,725, however, does not end the analysis. It is undisputed that in January 2010, Sunbelt increased Balding's salary to $40,000.  The evidence supports that he was told by his supervisor, Kathy Rutledge, that this increase was in lieu of commissions. (*Decl. of Kathy Rutledge* ¶ 6, Dkt. No. 60.) Balding disputes that testimony.  When asked in his deposition about this conversation, Balding simply denied being told the increase was in lieu of commissions. (*Balding Depo.* 104:16-105:3, Dkt. No. 72-36.)  Viewing the facts most favorably to Balding, a jury may reject Rutledge's testimony. Nevertheless, following the increase to his salary in January 2010, Balding was not paid commissions on any sales, but did receive and accept additional increases in salary to $45,000 in May 2011, to $52,000 in January 2012 and to $60,000 in May 2012.  During this same period, Balding received seven bonuses totaling $23,250. (*Balding Depo.* 119:12-120:10, Dkt. No. 72-36; *Decl. of M. Kowalski, Sr.* ¶ 11, Dkt. No. 62).  After the first salary increase in January 2010, the only evidence of a conversation Balding had with one of his actual supervisors about commissions was an email exchange with Michael Kowalski, Sr. in April 2012 in which Balding wrote:  " I could tell that you were surprised to hear of a commission which was written up for me. I would like you to know that I am grateful for profit sharing and other incentives Sunbelt Steel gives. I am here to help grow and become [a] huge part of Sunbelt Steel. If there could be some consideration that would be grateful." Kowalski, Sr. responded, "I plan to have follow-up conversations with Kathy & Jerry this week and will get back to you. Hang in there!"

---

[5] The court does not address whether the evidence would be sufficient for a jury to find what the amount of commissions would have been after January 2010.  The foundation for evidence Balding submits for sales in the years after 2010 is in dispute and the court need not resolve that issue given the court's ruling that Balding accepted new terms for compensation that did not include a commission.

6

(*Balding Appx.* Ex. D, Dkt. No. 72-4.)  There is no evidence in the record of the content of the referenced conversation, nor of any follow up.  Kathy Rutledge and Michael Kowalski, Jr. were Balding's direct supervisors.  When Balding was asked during his deposition why he did not raise the commission issue with his direct supervisors, Balding answered he did not know. (*Balding Depo.* 143:13-144:5, Dkt. No. 58-1.)

The record supports only that Balding was an at-will employee.  He admitted in his deposition that no one had told him his employment would be for a certain term. Under Utah law, "[a]n employment relationship for an indefinite term gives rise to a presumption that the employment relationship is at will." *Tomlinson v. NCR Corp.*, 2014 UT 55 ¶ 11. Nothing in the record would support a jury finding to the contrary. In assessing the rights of an at-will employee, two legal principles govern Balding's contractual rights.  First, "where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation," and "by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991).

 Second, "[w]here an agreement involves repeated occasions for performance by either party with knowledge of the nature of performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement" and can provide the basis for a waiver and estoppel. Restatement (Second) of Contracts § 202(4) (1979); *B.R. Woodward Marketing, Inc. v. Collins Food Service, Inc.*, 754 P.2d 99, 103-04 (Utah App. 1988) ("Stated another way, one cannot prevent a waiver by a private mental reservation contrary to an intent to waive, where his or her actions clearly indicate such an intent.").

These legal principles preclude Balding from claiming that, after accepting only salary and bonuses for four-and-one-half years, he actually had a different compensation agreement than the one he willingly accepted while an at-will employee free to resign at any time. (*See Balding Depo*. 127:11-17, Dkt. No. 58-1) ("Q. Did anybody at Sunbelt or Reliance tell you that you were guaranteed to be employed at Sunbelt for a particular length of time?" "A. No, not that I can recall." "Q. Do you agree that you had the right to resign from Sunbelt at any time for any reason if you wanted?" "A. Yes.").  On the evidence presented by Balding, a jury could find only that from January 2010 through the end of his employment in November 2013, Balding accepted salary increases, accepted bonuses, never complained to his direct supervisors about not receiving commissions, and never asked Sunbelt for an accounting or in any way made a demand for commission payments.  The one conversation with Kowalski, Sr. in April 2012 in which Balding said he would be grateful if some consideration could be given to a commission, even drawing all inferences in favor of Balding, is not sufficient for a jury to find, in the face of Balding accepting raises and bonuses for four-and-one-half years without complaint, that the original agreement for compensation including a commission had not been superseded by the parties' course of dealing. The court properly granted summary judgment on the first cause of action and there is no basis for the court to reconsider its ruling.

### 2. *Unjust Enrichment/Quantum Meruit*

The law is well established in Utah that the "doctrine of unjust enrichment is inapplicable when there is a contract between the parties." *Kirk v. Rockwell Collins, Inc.*, 2:12-cv-1107, 2015 U.S. Dist. LEXIS 20851 (D. Utah Feb. 3, 2015).  As the Utah Supreme Court has long held, "[u]njust enrichment is a doctrine under which the law will imply a promise to pay for goods or services when there is neither an actual nor an implied contract between the parties." *Concrete*

*Prods. Co. v. Salt Lake City,* 734 P.2d 910, 911 (Utah 1987). It is undisputed that Balding entered

an employment agreement with Sunbelt. Those undisputed facts preclude Balding from

succeeding on an unjust enrichment claim and required the court to grant summary judgment in

favor of the defendants. Nothing submitted by Balding in his motion for reconsideration supports

a different outcome.  Further, "[a]n employee cannot state a claim for unjust enrichment where

the employee was compensated for his services unless the employee presents facts showing that

his compensation as unreasonable or that the employer was unjustly enriched when it

compensated the employee." *Kirk*, *supra*, 2015 U.S. Dist. LEXIS 20851 at *24. Balding has not

presented such facts here.  Rather, Balding admits that prior to obtaining employment with

Sunbelt in 2009 he had been performing similar sales duties for another metals company, Encore

Metals, for which he received a salary of $30,000 per year plus a bonus based on company

performance and no commissions. (*Balding Depo.* 47-49, Dkt. No. 58-1.)  After leaving Sunbelt

in 2013, Balding admits that he worked for a competitor, Ryerson, performing similar sales

duties for $60,000 per year plus bonuses and no commissions, the same compensation structure

he had at Sunbelt. (*Id.* 68:25-69:7; 70:17-23.)  In other words, both before and after his

employment with Sunbelt, Balding earned exactly the same amount Sunbelt paid him for doing

the same kind of work. This is undisputed evidence showing that Balding's Sunbelt

compensation was not unreasonable, and for that additional reason his unjust enrichment claim

fails.

3. ***FMLA Interference and Retaliation***

Balding alleges that Sunbelt terminated his employment in interference with, or in

retaliation for, his exercise of his rights under the FMLA. Each of these claims requires proof of

distinct and separate elements and has separate burdens of proof.  *Metzler v. Federal Home Loan*

*Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006).  To establish a claim for FMLA

interference under 29 U.S.C. § 2615(a)(1), Balding must show (1) that he was entitled to FMLA

leave; (2) that some adverse action by Sunbelt interfered with his right to take FMLA leave; and

(3) that Sunbelt's action was related to the exercise or attempted exercise of his FMLA rights. *Id.*

at 1180. He must also demonstrate that he put Sunbelt on notice that he might be entitled to leave

under the FMLA. *Bones v. Honeywell Int'l Inc.*, 366 F.3d 869, 877, n. 2 (10th Cir. 2004).  The

burden shifting analysis under *McDonnell Douglas* does not apply to interference claims.  *Smith*

*v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir. 2002).  Nevertheless, if the

employee makes a prima facie showing of each element, the employer may defeat the claim by

proof that it would have taken the adverse action for legitimate non-retaliatory reasons,

regardless of the request for FMLA leave. *Metzler*, *supra*, 464 F.3d at 1180.

   To establish a claim for FMLA retaliation under 29 USC § 2615(a)(2), Balding must

establish that he (1) engaged in protected activity; (2) was subject to an adverse employment

action; and (3) a causal connection exists between the protected activity and the adverse action.

*Metzler*, 464 F.3d at 1171. If Balding successfully makes a prima facie showing of each element,

Sunbelt has the burden of demonstrating a legitimate, non-retaliatory reason for its termination

decision. *Id.* at 1172. Once Sunbelt does so, to defeat summary judgment, Balding must show a

genuine issue of disputed material fact as to whether Sunbelt's proffered reason is pretextual.[6] *Id.*

(*See Sunbelt Mot. S.J.* 26-27, Dkt. No. 53; *Balding Opp. Re S.J.* 34-35, Dkt. No. 71).

   For both the FMLA interference and retaliation claims, summary judgment turns on

whether Sunbelt terminated Balding's employment for legitimate, non-retaliatory reasons or

---

[6] The court disagrees with Balding's repeated assertion that *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) has any bearing on the court's analysis under the FMLA or the ADA.

whether the termination was a pretext.[7] It is undisputed that Balding was entitled to FMLA leave, that he had experienced a panic attack, and that he requested time off work. The evidence supports that Balding may have requested vacation time rather than unpaid FMLA, but was in the process of obtaining FMLA forms to submit to Sunbelt. Drawing all inferences in favor of Balding, a jury may find that he was requesting FMLA leave which Sunbelt understood. The evidence is undisputed that his supervisors told him to take time off work and that he was on leave at the time of his termination. Sunbelt submitted the following facts as undisputed in support of its motion.[8]

1.      Balding was an at-will employee of Sunbelt. (*Balding Depo.* 127:11-17, Dkt. No. 58-1.)

2.      On November 21, 2013, Balding reported to Sunbelt's Human Resources Manager that his doctor wanted him to take a few days off after a "panic attack," and he requested vacation. The next day, on November 22, 2013, Balding reported to Pickering that he had a scheduled appointment to see his psychiatrist. The following Sunday, on November 24, 2013, Balding reported to Pickering that he had been diagnosed with a condition related to his adrenal gland. On Monday, November 25, 2013, Balding told Kowalski, Sr. and Rutledge that he had low testosterone and low energy and, according to him, that he was taking medications and had scheduled an appointment to see his doctor. (*Balding Depo.* 159:18-160:22; 162:23-163:17;

---

[7] The court in its prior oral ruling did not separately analyze Balding's claims under the ADA because on the issue of pretext, the analysis is the same as the analysis under the FMLA. Because the court has granted the motion to allow Balding to proceed on the FMLA claims, and this pretext analysis still applies to Balding's claims of retaliation under the ADA, the court also allows the ADA retaliation claim to proceed. The court will separately address Balding's ADA claims of disability discrimination and failure to accommodate below.

[8] Sunbelt's statement of undisputed material facts is copied essentially verbatim from Sunbelt's Rule 56 Motion for Summary Judgment (*Sunbelt's Mot. Sum. J.* 23-26, 27; Dkt. No. 53.) The court has verified that the facts are supported by the referenced evidence.

168:4-171:3, Dkt. No. 58-1; *Decl. of N. Pickering* ¶¶ 3-7, Dkt. No. 63; *Decl. of M. Kowalski, Sr.* ¶ 14, Dkt. No. 62; *Decl. of K. Rutledge* ¶ 9, Dkt. No. 60.)

      3.      Balding alleges that, while communicating with Pickering regarding his desire to take leave, she told him that he needed to get his FMLA paperwork filled out. Balding claims to have obtained FMLA paperwork from his doctor that he filled out, but he has never produced it. (*Balding Depo*. 165:1-166:23, Dkt. No. 58-1.)

      4.      Balding understood that his request for leave was approved. On Monday, November 25, 2013, Kowalski, Jr. told him to take "the time that I needed." No one made a negative comment to Balding regarding his request for leave. No one at Sunbelt has ever denied Balding leave to address a health or medical issue. (*Balding Depo*. 162:5-7, 167:21-23, 217:5-218:16, 220:15-24; Dkt. No. 58-1.)

      5.      Because Balding was on leave, Kowalski, Jr. had Balding's emails forwarded to him for monitoring, a standard Sunbelt practice. On November 26, 2013, Kowalski, Jr. noticed that one of Balding's customers, Weatherford, had sent an email inquiry regarding the status of a purchase order number PO10407337. After an investigation, Kowalski, Jr. could not find any open order or invoiced order in Sunbelt's system that referenced PO10407337. In fact, the purchase order had not been entered. (*Decl. of M. Kowalski, Jr.* ¶¶ 10-12, Dkt. No. 61.)

      6.      In reviewing Balding's correspondence with Weatherford, Kowalski, Jr. discovered that, a few days earlier, on November 21, 2013, Balding had made a series of representations to Weatherford that the order was "in process." (*Decl. of M. Kowalski, Jr.* ¶ 14, Ex. 5; Dkt. No. 61.)

7.      Kowalski, Jr. identified a copy of PO10407337 from Weatherford later in the morning on November 26, 2013, and it was dated November 5, 2013, suggesting that Balding had received the order three weeks earlier. (*Decl. of M. Kowalski, Jr.* ¶ 13, Ex. 7; Dkt. No. 61.)

8.      Kowalski, Jr. arranged a telephone call with Balding to find out what happened. Balding admitted to Kowalski, Jr. that he had not received a copy of PO10407337 from Weatherford until that morning, November 26, 2013, the same day Weatherford had expected the order to be shipped. Kowalski, Jr. asked Balding why, if he did not have a copy of PO10407337 until November 26, 2013, he had told Weatherford five days earlier that the same order was "in process," that he was "rushing this through" and that it would have a dock date in "three days." Balding alleges that he did not deny that he had made the representations to Weatherford, but tried to explain why the representations were not misleading. He admits that Kowalski, Jr. accused him of lying about the order, and when Kowalski, Jr. asked him why he would be untruthful, he responded "I don't know." (*Balding Depo.* 182:8-12; 183:12-23, Dkt. No. 58-1; *Balding Unempl. Tr.* 18:2-8, Dkt. No. 58-1, p. 75; *Decl. of M. Kowalski, Jr.* ¶ 15, Dkt. No. 61.)

9.      Balding admitted that, although he had only a PO number on November 21, 2013, when he represented to Weatherford that its order was "in process," he needed more information than a PO number "to get an order in process." Balding knew the steps that were necessary to process a purchase order for the Weatherford PO 10407337, and Sunbelt confirmed that none had been performed. (*Balding Depo.* 173:8-177:1; 178:13-181:24, Dkt. No. 58-1; *Balding Unempl. Tr.* 12:3-7, Dkt. No. 58-1, p. 74; *Decl. of T. Perrin* ¶¶ 5, 7-8; Dkt. No. 64.)

10.     When Sunbelt reported to Weatherford that its order would be delayed, its representative indicated that she believed she had been misled by writing: "[M]y contact at Sunbelt has given me false information." (*Decl. of T. Perrin* ¶ 7, Ex. 5, p. 4; Dkt. No. 64.)

11.     Kowalski, Jr. had given Balding two previous formal written warnings regarding his poor communications with customers and Sunbelt employees, one on August 27, 2013, and one on November 14, 2013. Balding does not dispute the grounds for those warnings. Balding was on notice that termination would be considered if his performance did not improve. Kowalski, Jr. recently had received a complaint from another customer who demanded to be reassigned to another salesperson because Balding had not provided accurate information. (*Balding Depo.* 131:1-6; 132:16-20; 151:20-152:24, Dkt. No. 58-1; *Decl. of M. Kowalski, Jr.* ¶¶ 4-8, Ex. 1-4; Dkt. No. 61.)

12.     Balding's misrepresentations to Weatherford violated Sunbelt's Employee Handbook, a copy of which had been given to Balding. The Handbook stated that providing false or misleading information was grounds for immediate termination. (*Balding Depo.* 123:21-124:4, Dkt. No. 58-1; *Decl. of M. Kowalski, Jr.* ¶ 16, Ex. 8; Dkt. No. 61.)

13. Kowalski, Jr. reported Balding's handling of the Weatherford order to Kowalski, Sr. and Rutledge. All concluded that Balding's conduct justified the immediate termination of his employment, especially in light of Kowalski, Jr.'s two previous written warnings. (*Decl. of M. Kowalski, Sr.* ¶ 15, Dkt. No. 62; *Decl. of M. Kowalski, Jr.* ¶ 16, Dkt. No. 61; *Decl. of K. Rutledge* ¶ 10, Dkt. No. 60.)

14.     On November 26, 2013, about 30 to 45 minutes after Kowalski, Jr. questioned Balding about the Weatherford order, Rutledge called Balding and informed him of Sunbelt's decision to terminate his employment. (*Balding Depo.* 187:23-188:25, Dkt. No. 58-1.)

15.     Since the time Sunbelt terminated Balding's employment, he has worked continuously at two Sunbelt competitors performing the same outside salesperson duties he performed for Sunbelt without an accommodation of any disability. Balding has not told his post-

Sunbelt employers that he has any medical condition that would affect his ability to perform his job, and he has not taken any leaves of absence for any medical or mental health reason. (*Balding Depo.* 59:3-62:3, 67:12-23, 72:7-73:17; Dkt. No. 58-1.)

The evidence supports the facts cited by Sunbelt. Balding argues that they are disputed, but the dispute is primarily argumentative rather than factual. For example, Balding argues that the employment was not at-will because of rights created by the FMLA and the ADA, that Balding requested "time off" rather than specifically asking for vacation time. (*See Balding Opp. Re S.J.* 12-13, Dkt. No. 71.) Similarly, Balding often cites to his declaration which is largely a paraphrase of the allegations in the complaint that are conclusory and lack foundation.[9] The court rejected these assertions as lacking evidentiary support. Nevertheless, some of Balding's "disputed facts" warrant further discussion.

The thrust of the dispute turns on whether Sunbelt terminated Balding for legitimate, non-discriminatory reasons, which would defeat the interference claim, and whether Balding met his burden from which a jury could find the reasons were a pretext under the retaliation claim. The core facts are not in dispute. While Balding was on leave, Sunbelt rerouted copies of his emails to his supervisor, Kowalski, Jr. In reviewing the emails on November 26, 2013, Kowalski, Jr. learned that Balding had told a customer, Weatherford, that an order for steel bars was "in process," that Balding was "rushing this through," and it would have a dock date in "three days." When Kowalski, Jr. checked on the status of the order, he learned that no order had been entered into Sunbelt's sales order and processing computer system. Upon further review of the emails,

---

[9] Both Reliance and Sunbelt filed Evidentiary Objections to Balding's Declaration requesting the court to disregard and/or strike certain paragraphs as deficient material. (Dkt. No. 75-1, Dkt. No. 76-1). In ruling on the motion for summary judgment the court elected to disregard the statements that were conclusory or lacked foundation. The court now finds that defendants' objections were well taken as to the following paragraphs: 3, 5-7, 11-18 and Exhibit C, 19-35, 41 and Exhibit J, 45-46, 48, 49, 51, 54 and Exhibit O, 55, 57-59, 68-73, 75-79, 85-87, 89-90.

Kowalski, Jr. learned that Balding had a purchase order number, PO10407337, as early as November 21, 2013, the same date he made the above representations to Weatherford. Attached to the November 26, 2013 email dated 9:23 AM was a hard copy purchase order with the same number, PO10407337, bearing on its face a date of November 5, 2013, which suggested to Kowalski, Jr. that Balding had received the order some three weeks earlier but failed to enter it into the system before making representations to the customer. Earlier exchanges in the email chain reviewed by Kowalski, Jr., to be clear, did not reflect the previous delivery of a hard copy purchase order with the details necessary to process the order. Rather, the email chain reviewed showed only that a bid request had been submitted and a number provided.

Kowalski, Jr. then called Balding and asked him why he had not entered the order. Balding responded, "I don't know."  Balding alleges that he did not deny making the representations to Weatherford, but that Kowalski, Jr. accused him of lying about the order. Balding told Kowalski, Jr. that he had only received the hard copy for the first time on November 26, 2013, but that he had "reserved" the order with Sunbelt personnel and had been told delivery could be made within about three days. Balding acknowledged that he knew the steps to process an order and that a hard copy was required. None of the required steps had been performed when Balding told Weatherford that the order was in process. Balding had previously received two written notices about his performance with customers and had been told that if his performance did not improve, he may be terminated. Balding claims he disputed the prior warnings. After discussing the situation, Sunbelt made the decision to terminate Balding and communicated his termination to him. When Sunbelt reported to Weatherford that the order would be delayed, its representative responded that "[M]y contact has given me false information."

Balding argues that additional facts, when the inferences are drawn in his favor, are sufficient for a jury to find both that the reasons given for his being fired were not legitimate and non-retaliatory and that they were a pretext for the real reason, which was his request for FMLA leave to address his medical issues.  As previously discussed, the majority of Balding's asserted additional facts are conclusory, lack foundation, or are misrepresentations of or unsupported by the evidence.  The court did, however, review several facts relevant in its reconsideration analysis, as follows:

1.      During Balding's employment with Sunbelt, Balding informed Jerry Wasson, previously a Vice President at Sunbelt, that he suffered from bipolar disorder and was taking medication to treat it, and that he suffered from low testosterone. (*Answer* ¶ 103, Dkt. No. 34.)

2.      On August 28, 2013, Balding told Nancy Pickering, the Human Resources Manager at Sunbelt, that he had ADD and as a result, sometimes has trouble communicating. (*Balding's Appx.*, Ex. I; Dkt. No. 72-9.)

3.      According to a November 13, 2013 note in Balding's employee file provided to him during discovery, on November 7, 2013 a Sunbelt representative who called Balding to speak to him about issues on his expense report noted that "he sounded like he was crying" and that "he sounded very depressed." (*Balding's Appx.*, Ex. J; Dkt. No. 72-9.)

4.      On November 21, 2013, Balding told Pickering that he had experienced a panic attack on November 20, 2013. (*Answer* ¶ 100, Dkt. No. 34.) As a result, Balding requested time off. (*Balding's Appx.*, Ex. M; Dkt. No. 72-13.)

5.      According to another file note dated November 22, 2013 provided to Balding by Sunbelt during discovery, Balding complained to a Sunbelt representative on November 18 about his supervisor Michael Kowalski, Jr.'s latest performance write-up. The note also stated that on

November 19, Balding had called, crying, about a complaint he had received concerning one of his orders and that he was very upset. The note indicated that the representative suggested that Balding take a few days off work to clear his head. The note went on to identify Balding's November 21, 2013 e-mail about experiencing a panic attack on November 20 and his request for time off. Finally, the note indicated that the representative met with Michael Kowalski, Sr., the President of Sunbelt, and Nancy Rutledge, the Executive Vice President of Sunbelt, on November 22, 2013 and that "we are all in agreement that after the first of the year, we may have to proceed with termination." (*Balding's Appx.*, Ex. O; Dkt. No. 72-15.)

6.      On November 24, 2013, Balding told Pickering that he suffered from low testosterone and problems with his adrenal glands, conditions for which he had seen a doctor on November 22, 2013. (*Answer* ¶ 100, Dkt. No. 34.)

9.      Also on November 24, 2013, Balding spoke with Pickering by telephone to discuss his time off starting the next day, November 25, 2013, to which Pickering responded: "This works for us, take some time off and get better." (*Balding Decl.* ¶ 56, Dkt. No. 72-1.)

10.     On the next day, November 25, 2013, Sunbelt's information technology personnel routed Balding's email and Outlook contacts to Kowalski, Jr. (*Balding's Appx.*, Ex. P; Dkt. No. 72-16.) On the same day, Kowalski, Sr. and Rutledge called Balding and discussed his medical conditions. (*Balding Depo.* 168-170, Dkt. No. 58-1; *Decl. of K. Rutledge* ¶ 9, Dkt. No. 60; *Decl. of M. Kowalski, Sr.* ¶ 14, Dkt. No. 62.)

11.     On November 26, 2013 Kowalski, Jr. reviewed the email from Weatherford inquiring about the status of its order; reviewed an e-mail from Todd Perrin, at that time an Inside Sales Manager, stating that the order was not in Sunbelt's system; and reviewed the

purchase order sent via e-mail by Weatherford shortly thereafter, which had an order date of November 5, 2013. (*Decl. of M. Kowalski, Jr.*, Dkt. No. 61.)

12.     Kowalski, Jr. then called Balding and asked him why he had not entered the Weatherford order, to which Balding responded "I don't know." (*Balding Depo.* 182:8-12, Dkt. No. 58-1.)  Kowalski, Jr. asked Balding if he had told Weatherford that the order was in process and that he was rushing it through. (*Id.* at 182:13-23.)  Kowalski, Jr. also accused Balding of being untruthful to him about what he had told Weatherford about the order. (*Id.* at 183:12-17.)

13.     Although the purchase order was dated November 5, 2013, Balding told Kowalski, Jr. he had not received it until the morning of November 26, 2013, at which time he immediately forwarded it to another Sunbelt employee. (*Id.* at 183:19-23.)

14.     Balding claims he also tried to explain that he had not misrepresented the status of the order because he had previously "reserved" or "pulled out" the steel bars he would need for the order by calling someone in the warehouse; and that he had contacted Mr. Melvin Watson in the shop to ask how long it would take for this rush job, and was informed three days. (*Id.* at 179-183.)

15.     Sunbelt does not dispute that Kowalski, Jr. accused Balding of lying to him about the Weatherford customer order and supported his termination on that basis.  (*Sunbelt's Reply to Balding's Add'l Facts* ¶ 37, Dkt. No. 76-2.)  The metadata in the Weatherford PDF purchase order identifies a creation date of November 26, 2013 at approximately 9:21 a.m. Central Time. (*Balding's Appx.*, Ex. Q; Dkt. No. 72-17.) Sunbelt admits that it has no evidence that Balding actually received the purchase order earlier than November 26, 2013. (*Sunbelt's Reply to Balding's Add'l Facts* ¶¶ 40-42, Dkt. No. 76-2.)

16.     After Sunbelt management discussed the Weatherford purchase order situation and its conversation with Balding about the situation, Sunbelt terminated Balding on November 26, 2013, the same day Kowalski, Jr. first raised the concerns about the Weatherford purchase order. Sunbelt has produced no evidence that prior to making the decision to terminate Balding it had investigated his claims that he had only received the hard copy that same day, that he had previously reserved the bars with the warehouse, or that he had previously discussed an estimated delivery date with the shop. Sunbelt presented no evidence that it asked Weatherford when it had in fact placed the order or whether there had been prior discussions about the order from which Balding could have attempted to reserve the bars.

The question before the court on the motion to reconsider is whether these additional facts would be sufficient to support a jury verdict in Balding's favor if all of the inferences are drawn most favorably to him. In its initial ruling, the court was persuaded by the argument that the undisputed material facts supported that Sunbelt believed in good faith at the time it made the decision to terminate Balding that he had misrepresented to Weatherford that the purchase order was in process and would be delivered to the dock within three days. After all, this was not the first (or even second) time that a customer had indicated that Balding had provided inaccurate information. The court concluded that if Sunbelt management acted in the good faith belief that he had made misrepresentations to a customer at a time when Balding had not entered any purchase order into Sunbelt's system, that belief established a legitimate, non-retaliatory reason for the decision to terminate. *See Lobato v. New Mexico Env't Dept.*, 733 F.3d 1283, 1289 (10th Cir. 2013) (The "relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."). The court, however, failed to consider whether on the additional facts provided by

Balding a jury could reasonably infer that Sunbelt's explanation was a pretext and the real reason was Balding's request for FMLA leave necessitated by his medical conditions.

The facts that would support such an inference include that Sunbelt had knowledge of a number of Balding's medical issues prior to November 26, 2013; that Sunbelt made the decision to terminate Balding the very same day it learned of the alleged misrepresentation to Weatherford, knowing he was on leave and without a meaningful investigation to verify Balding's explanation; and that senior management had previously agreed that Balding may have to be terminated at the first of the year, again being fully aware at the time that his medical issues may require FMLA leave. Further, management was at least on notice that the customer may not have fully disclosed that it had only sent in the hard copy purchase order on November 26, 2013, while back dating the order to November 5, perhaps to cover its representative's own lack of diligence. A jury may infer from these facts that Sunbelt management may have used the alleged problems with the Weatherford order as cover to terminate Balding because they no longer wanted to have to deal with his health issues. If such inferences can be reasonably drawn from the admissible evidence, the motion to reconsider reasonably states grounds that the court erred in failing to construe the facts in a light most favorable to Balding.

The Tenth Circuit recently addressed an FMLA claim on facts very similar to those in this case. *Olson v. Penske Logistics, LLC*, No. 15-1380, 2016 U.S. App. LEXIS 15780 (10th Cir. August 26, 2016). In that case, the plaintiff requested FMLA leave to deal with a medical condition. The same day that he began his leave, the employer learned that there were problems with the inventory at the warehouse the plaintiff managed. The following week, when management began to investigate, it learned that the problems with the inventory had created a "crisis" and was putting at risk a relationship with a major customer. *Id.* at *5. The employer then

undertook additional investigation which confirmed the problems and concluded they were a result of a "lack of processes and training" by the plaintiff. *Id.* at *6. The management initially discussed bringing in a temporary replacement for the plaintiff and then terminating him on his first day back from FMLA leave. *Id.* at *7. Before terminating the plaintiff, however, management continued its investigation to verify whether the plaintiff was on approved FMLA leave and also brought in a loss prevention team to audit the warehouse thoroughly. The further investigation supported that the problems were worse than initially believed and that the plaintiff had engaged in dishonest conduct to cover up the problems. The loss prevention report recommended that the plaintiff be terminated. *Id.* at *8-11. He was terminated the next day while he was still on FMLA leave and two weeks after the issue first arose. *Id.* at *11-12.

The district court in *Olson* granted summary judgment in favor of the employer which was affirmed on appeal. The court concluded that on these facts the evidence was not sufficient to connect the termination to plaintiff's request for FMLA leave and rejected plaintiff's claim that the district court had failed to draw the inferences most favorable to plaintiff. Plaintiff argued that if he had not taken leave, he would have been at work and would have been able to defend his job performance and perhaps have shown that the problems were really the fault of the inventory clerk. *Id.* at *13. He also argued that he was really fired for missing too much work, which placed a travel burden on his supervisor causing the supervisor to resent him and motivating him to want to replace plaintiff. *Id.* at *14. The court rejected both arguments, stating that while they seem "plausible," plaintiff had failed to provide sufficient support in the record to create a genuine issue of material fact. *Id.*

Balding's case is distinguishable from the *Olson* case. First, the relevant facts reviewed by the court in support of Balding's claim are supported by the record. Second, in *Olson*, the

employer did not act on its initial impulse to terminate the employee, but conducted a thorough investigation which confirmed the severity of the problem and disclosed dishonesty and an attempted cover up. In Balding's case, Sunbelt's only investigation was done in short period of time on the same day that it made the decision to terminate. *See Smothers*, *supra*, 740 F.3d at 539 ("A failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext.") (internal quotations omitted). Sunbelt did not follow up on Balding's explanations, and a jury may reasonably conclude that further investigation would have confirmed what Balding said. Finally, and significantly, the jury may reasonably infer from management's statement that they may have to terminate Balding at the first of the year that the issue with the Weatherford purchase order was simply an opportunity and excuse to accelerate the date of termination to avoid having to deal with the medical issues for which Balding had requested leave.

Sunbelt has presented a strong case that it had good cause to terminate Balding for poor performance and dishonesty. Nevertheless, Balding has also presented evidence, which if believed by the jury, could support that the real reason for the termination was Balding's health issues for which he requested FMLA leave. The requirement that the court draw all inferences most favorably to Balding mandates that the court allow him the opportunity to try to convince the jury.

### 4. *ADA Discrimination and Failure to Accommodate*

The court's prior ruling on Balding's ADA claims focused on its conclusion that Sunbelt's proffered reasons for terminating Balding's employment were not a pretext. On reconsideration, having ruled that Balding may proceed on his FMLA claims and ADA retaliation claim to prove otherwise, the court must now separately address plaintiff's argument that Balding has failed to

established a prima facie case that he was "disabled" within the meaning of the ADA, which is the first element in both his ADA discrimination and failure to accommodate claims. *See* 42 U.S.C. § 12112(a) and *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (as to ADA discrimination claims); *Selk v. Brigham Young University*, 2015 WL 150250, *5 (D. Utah Jan. 12, 2015) (as to ADA failure to accommodate claims).

A person is "disabled" under the ADA if he has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). To satisfy this requirement, Balding "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014).  Lay evidence is insufficient to establish either a recognized impairment or the limitations the impairment imposes on an individual's major life activities.  *Id.* at 651.  The court has already determined that Balding's after-the-fact attempt to submit a physician's declaration to bolster his claims is not newly discovered evidence and is thus inadmissible.  Upon careful review of the record, the court can find no admissible medical evidence of any recognized impairment combined with evidence of the limitations imposed from such impairment on one or more of Balding's major life activities.  Balding's medical records were exchanged during discovery, but the only evidence in the record regarding those medical documents comes from defendants' counsel, who submitted a declaration stating that upon review of the records, (1) no diagnosis of an adrenal gland disorder in 2013 could be located, (2) no evidence could be found of any limiting effect of Balding's slightly lower than normal testosterone level, (3) no evidence could be found of any limiting effects caused by references in the records to bipolar disorder, anxiety, benign familial

tremor, panic attack, and depression, and (4) a February 2013 reference to ADHD stated the condition was "well controlled." (*Decl. of J. Barrett* ¶ 4, Dkt. No. 58).

Several nearly identical paragraphs in the Amended Complaint and in Balding's declaration provide lay evidence of various impairments and limitations asserted by Balding, and there is evidence in the record that Balding told various individuals at Sunbelt about some of them.  Under Tenth Circuit law, "[s]uch lay evidence, however, is inadmissible in court and thus cannot be used to oppose summary judgment." *Felkins*, *supra*, 774 F.3d at 651-52 (plaintiff's declarations identifying her medical diagnoses, limitations, and who she told of these conditions were insufficient proof of impairment for an ADA claim because her own opinions do not establish diagnoses and are not proper evidence that her limitations are caused by such diagnoses.)  Furthermore, the record is also undisputed that after Balding was terminated from Sunbelt, he obtained replacement employment with two competitor companies performing "similar" duties and responsibilities, that he did not inform either employer of his litany of medical conditions, and that he has not asked for an accommodation including medical leave for any disability. (*Balding Depo*. 59-61, 70-72; Dkt. No. 58-1.)

On this record, the court agrees with Sunbelt that Balding has not met his burden of establishing a prima facie case that he is "disabled" under the ADA.  This defeats his claims for ADA discrimination and ADA failure to accommodate.[10]  The court notes, in addition, that Balding has also failed to show that he requested any accommodation from Sunbelt that he did not receive. (*Balding Depo.* 158:6-159:11, 217:5-218:16; Dkt. No. 58-1.)  This independently defeats Balding's ADA failure to accommodate claim.

---

[10] Failure to establish an actual disability is not required to prosecute an ADA retaliation claim, on the other hand.  Rather, "the plaintiff need only show that he had a reasonable, good-faith belief that he was disabled." *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178 (10th Cir. 2016).  There is sufficient evidence in the record to support Balding's good-faith belief that he was disabled; thus, for the reasons stated in Section 3, *supra*, Balding's ADA retaliation claim may proceed.

**CONCLUSION**

The court rejects and denies Balding's motion to reconsider its ruling dismissing defendant Reliance, dismissing the breach of contract claims, and dismissing the ADA discrimination and failure to accommodate claims, but grants the motion to reconsider its decision to dismiss the FMLA and ADA retaliation claims. (Dkt. No. 89.)  As to those claims the order granting summary judgment is vacated and the claims will proceed.

DATED this 24th day of October, 2016.

BY THE COURT:

_____
CLARK WADDOUPS
United States District Court Judge