IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ROBERT J. BALDING,<br><br>               Plaintiff,<br><br>v.<br><br>SUNBELT STEEL TEXAS, INC.;<br>SUNBELT STEEL TEXAS, LLC;<br>RELIANCE STEEL & ALUMINUM CO.;<br>DOES 1 through 50, inclusive,<br><br>               Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTIONS AND GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION**<br><br>Case No. 2:14-cv-00090<br><br>Judge Clark Waddoups |

      This is plaintiff Robert J. Balding's second motion for reconsideration of his contract, quantum meruit, and ADA discrimination and failure to accommodate claims. (Dkt. No. 104.) Balding has also moved to amend his summary judgment pleadings to include supplemental disclosure of expert testimony in support of his ADA claims. (Dkt. Nos. 108-109). For their part, defendants Sunbelt Steel Texas, Inc. and Sunbelt Steel Texas, LLC (collectively "Sunbelt") move the court to reconsider its October 24, 2016 decision vacating summary judgment in favor of defendants on Balding's FMLA interference and retaliation claims and his ADA retaliation claim.[1] (Dkt. No. 105.) For the reasons stated below, the court DENIES Balding's motions and GRANTS Sunbelt's motion. Accordingly, all of Balding's claims are dismissed and the matter is ripe for Balding's pending appeal.

---

[1] The court finds that oral argument would not materially assist the court in deciding the issues presented, so the court issues this order based on the transcript of the summary judgment motion hearing, its October 24, 2016 decision, and on the written briefs and supporting materials.

1

**BALDING'S MOTIONS**

I.  **Motion for Reconsideration Legal Standard**

As he did in his first motion for reconsideration, Balding brings his second motion for reconsideration under Rules 52, 56, 59, and 60 of the Federal Rules of Civil Procedure. The Tenth Circuit has held that "regardless of how it is styled or construed . . . , a motion filed within ten days of the entry of judgment that questions the correctness of the judgment is properly treated as a Rule 59(e) motion." *Phelps v. Hamilton*, 122 F.3d 1309, 1323 (10th Cir. 1997).[2] Furthermore, when a motion involves "reconsideration of matters properly encompassed in a decision on the merits," it is properly considered under Rule 59(e). *Id.* at 1324. Because Balding's motion was timely filed, the court construes Balding's motion as a motion to alter or amend the judgment under Rule 59(e).

Rule 59(e) relief is limited, and requires that Balding establish "(1) an intervening change in the controlling law, (2) new evidence [that was] previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Also relevant is the Tenth Circuit's admonition that successive motions "are inappropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments or supporting facts which were available at the time of the original motion." *Id.* "Absent extraordinary circumstances . . . the basis for [a] second motion must not have been available at the time the first motion was filed[,]" and "[i]t is not appropriate to revisit issues already addressed or advance arguments that could have been raised

---

[2] The rule has subsequently been modified to extend to 28 days the time within which to file a post-judgment motion. *See* Fed. R. Civ. P. 59(b) and (e), amended Mar. 26, 2009, eff. Dec. 1, 2009.

in prior briefing."[3] *Id.* The court refers to the relevant factual background in its prior order and does not repeat that factual history here.

## II. Contract Claim

Balding does not present new evidence or identify a change in the controlling law regarding his contract claim. Instead, he merely asserts that the court's ruling against him on these claims is "flawed," "absurd," "false" and made "in error." (*Pl.'s Motion* 7-9; Dkt. No. 104.) He claims that the court should not have granted summary judgment against him on his contract claims because there are disputed facts regarding whether his commissions were to be based on all sales accounts or limited to new accounts, and on whether Kathy Rutledge or anyone else ever told him that his salary increase was in lieu of his original commission compensation agreement. He also claims that the court ignored evidence that he discussed commissions with Jerry Wasson, Sunbelt's Vice President of Sales, who was instrumental in hiring Balding and making the original commission agreement with him. (*Id.* at 6.)

Similarly, he argues that the court failed to consider Balding's e-mail communication with Michael Kowalski, Sr. about commissions in the light most favorable to Balding, namely, that Kowalski's "silence" and failure to follow up on Balding's e-mail is "a form of deceit and evidence of guilt" about which a jury can "draw inferences in Balding's favor." (*Id.* at 6-7.) He claims there is "not a shred of evidence anywhere" that his commissions would not be paid per the original agreement. (*Id.* at 5.) Finally, he argues that he never "accepted new terms for

---

[3] Balding cites no extraordinary circumstances to warrant the court's reconsideration of his claims against Reliance Steel, Sunbelt's parent company, which he requests only in a footnote in his motion. (*Pl.'s Motion* 5 n. 1; Dkt. No. 104.) Based on this cursory request, which he expanded only in his reply brief, the court declines to revisit its prior ruling dismissing Balding's joint employer/enterprise theory claims against Reliance. *See Reedy v. Werholtz*, 600 F.3d 1270, 1274 (10th Cir. 2011) ("a party waives issues and arguments raised for the first time in a reply brief.") Furthermore, in light of the court's decision herein dismissing Balding's FMLA and ADA claims against Sunbelt on the grounds that their reasons for terminating him were not a pretext, his claims against Reliance are moot. (*See Hr'g Tr.* 93-99; Dkt. No. 86.)

3

compensation that did not include a commission" because such an acceptance requires an offer, which he claims he did not receive, or at least that there are disputed facts as to whether he had knowledge of new or changed conditions in his employment compensation. Any "private mental reservations" about Balding's commissions are Sunbelt's, not his, according to Balding. (*Id.* at 9-10.)

The court has previously agreed that there are disputed facts regarding the meaning of terms in Balding's original commission agreement and whether Rutledge informed Balding that his increased salary was in lieu of commissions. Whether the commissions were originally to be paid on all sales accounts or only new accounts was not material to the court's conclusion, however, while the court acknowledged that a jury may reject Rutledge's testimony. (*Mem. Dec.* 6; Dkt. No. 103.) The court also acknowledges that its prior decision does not refer to Balding's communications with Wasson regarding commissions. Because it was undisputed that Wasson had no employees reporting to him and was not Balding's supervisor, however, this evidence was also not material to the court's conclusion. Furthermore, Balding's deposition testimony reflects that these communications with Wasson occurred prior to Balding accepting his first raise in January 2010, and thus do not support his assertion that he believed he was entitled to them after his original compensation terms were superseded by the parties' subsequent course of performance. (*Balding Depo*. 105:11-25; Dkt. No. 72-36.)

As for Balding's communications with Kowalski, Sr., the court is not required to accept Balding's "speculation" or "suspicion" to comply with its obligation to view facts in the light most favorable to the non-moving party. *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988). Rather, "[t]he litigant must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Id.* As discussed in the court's previous order, the

4

only communication Balding had with a supervisor about his commissions after January 2010 was with Kowalski, Sr. in April 2012. To recap, Balding wrote: "I could tell that you were surprised to hear of a commission which was written up for me. I would like you to know that I am grateful for profit sharing and other incentives Sunbelt Steel gives. I am here to help grow and become [a] huge part of Sunbelt Steel. If there could be some consideration that [sic] would be grateful." (*Mem. Dec.* 6; Dkt. No. 103.) Kowalski, Sr.'s response was: "I plan to have follow-up conversations with Kathy & Jerry this week and will get back to you. Hang in there!" There is no evidence of any follow up. *Id.* The court need not accept Balding's conclusion that Kowalski, Sr.'s "[s]ilence is a form of deceit and evidence of guilt" to view this e-mail in the light most favorable to Balding. At most, viewed in Balding's favor, it suggests that he inquired about commissions to a direct supervisor once in April 2012.

The key point that Balding misses is Sunbelt's undisputed history of increasing his salary and paying bonuses in a manner at odds with the agreement Balding continues to assert was breached by Sunbelt's failure to pay him commissions. In January 2010, as the court previously summarized, Sunbelt increased Balding's annual salary from $30,000, as stated in his hiring contract, to $40,000. This $10,000 increase was more than double the $3,725 in commissions Balding may have been entitled to by the end of 2009. (*Mem. Dec.* 5-6; Dkt. No. 103.) Even if a jury were to discount Rutledge's testimony that she informed Balding the salary increase was in lieu of the commission agreement, thereafter, Sunbelt increased Balding's salary to $45,000 in April 2011 and again to $52,000 in January 2012. And most fatal to Balding's claim that he did not accept salary increases and bonuses in lieu of commission, in May 2012, one month after Balding's e-mail to Kowalski, Sr. asking for "some consideration" of commissions, Sunbelt increased Balding's salary to $60,000. Five months after that, Balding received a $13,000 bonus.

All in all, Sunbelt doubled Balding's salary and gave him $23,250 in bonuses based on the company's overall performance from 2009 to 2013. *Id.* None of these salary increases or bonuses was made pursuant to the terms of the original employment compensation agreement, and Balding admitted that he never raised the issue of commissions with anyone else at Sunbelt after April 2012. (*Balding Depo.* 115:8-11; Dkt. No. 72-36.)

Contrary to Balding's arguments, the undisputed history of Balding retaining his employment as an at-will employee after Sunbelt paid him compensation at odds with his initial agreement constitute more than "a shred of evidence" that his employment contract had been superseded by new or changed conditions. *See Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991) ("where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation," and "by continuing to stay on the job, although free to leave, the employment supplies the necessary consideration for the offer."). Even viewing in his favor Balding's claim that he raised commission objections to Kowalski, Sr. once in April 2012 prior to receiving his final raise and bonus payment, Balding's assertion that he did not accept these new terms, or was not aware of them, is inconsistent with his having accepted the money and his continuing to work for Sunbelt thereafter. *See B.R. Woodward Marketing, Inc. v. Collins Food Service, Inc.*, 754 P.2d 99, 103-04 (Utah App. 1988) ("Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement."). Balding did not submit sufficient evidence for a factfinder to find that these new and changed conditions of employment did not constitute a

course of performance that waived the original commission-based compensation agreement pursuant to *Johnson* and *B.R. Woodward*.

For all of the foregoing reasons, as well as the reasons set forth by the court in its prior rulings, the court concludes that it properly granted summary judgment to defendants on Balding's contract claims.

### III. Quantum Meruit Claim

Balding does not present new evidence or identify a change in the controlling law regarding his quantum meruit claim. Instead, he mischaracterizes the court's decision as contradictory. (*Pl.'s Motion* 11; Dkt. No. 104.) First, he alleges, the court ruled that Balding had a contract with Sunbelt, and then, that Balding was "an at-will employee with no contract of employment." *Id.* That is not what the court said. Rather, the court found that Sunbelt had both a contract with Balding and an at-will relationship. (*Mem. Dec.* 7, 9; Dkt. No. 103.) These are not contradictory. "An at-will relationship does not mean that there is no contract between employer and employee. The at-will rule merely 'creates a presumption that any employment contract which has no specified term of duration is an at-will relationship.'" *Cook v. Zions First Nat'l. Bank*, 919 P.2d 56, 60 (Utah App. 1996).

The consequence of Balding's at-will relationship with Sunbelt is that Balding's assertion of a commission-based compensation contract, even if its terms were superseded by a course of performance between the parties that substituted for the original contract terms, precludes Balding's claim for unjust enrichment or quantum meruit. *Concrete Prods. v. Salt Lake City*, 734 P.2d 910, 911 (Utah 1997) ("Unjust enrichment is a doctrine under which the law will imply a promise to pay for goods or services where there is neither an actual nor an implied contract between the parties.")

7

Balding also argues that the court failed to consider the "proper test" for a quantum meruit claim, including facts he submitted claiming that two other salespersons at Sunbelt were paid more than he was. These facts, he asserts, require the court to allow his claim to go forward so that a jury can determine whether Sunbelt was unjustly enriched by his labor and retained the benefits of that labor without payment for its value. (*Pl's Motion* 11-12; Dkt. No. 104). Even if Balding's quantum meruit claim were not precluded by his contract claim, Balding has failed to present sufficient evidence to support it. Balding's assertion that two other sales employees were paid more than he was does not meet the requirements to prove a quantum meruit claim. Balding presented no evidence demonstrating that he and the other employees were substantially similar in experience, performance, number of accounts managed and volume of sales, etc. Rather, there was undisputed evidence that Sunbelt paid Balding exactly what his skills and experience warranted in the marketplace, as demonstrated by his earnings from Sunbelt's competitors at the time he was hired and after he was terminated from Sunbelt. (*Mem. Dec.* 8-9; Dkt. No. 103.) For both reasons, the court declines to reconsider this ruling.

## IV. ADA Discrimination and Failure to Accommodate Claims and Motion to Allow Supplemental Disclosure of Expert Testimony in Support

In its October 2016 Memorandum Decision and Order, the court reversed its grant of summary judgment to defendants and allowed Balding's FMLA interference and retaliation claims, as well as his ADA retaliation claim, to go forward. This decision was based on the court's conclusion, upon reconsideration, that it had failed to adequately draw the appropriate inferences in Balding's favor on facts that may support a finding of pretext regarding Sunbelt's reasons for firing Balding. (*Mem. Dec.* 9-23; Dkt. No. 103.)

As a result, the court conducted a separate analysis of Balding's ADA discrimination and failure to accommodate claims, concluding on reconsideration that these claims were correctly

8

dismissed because Balding failed to establish a prima facie case of disability under the ADA and because there was no evidence that Sunbelt failed to grant any of Balding's requests for accommodation. *Id.* at 23-25. Balding's current motion for reconsideration challenges this analysis, and separate motions seek to bolster support for his prima facie case of disability by submitting for admission Dr. Allred's Declaration and Supplemental Expert Disclosure.

Because the court concludes below that its original pretext ruling was correct and that all of Balding's FMLA and ADA claims should be dismissed on that basis, it is not necessary for the court to rule on Balding's motion to reconsider the ADA discrimination or failure to accommodate claims or the motion to admit Dr. Allred's Declaration and Supplemental Expert Disclosure. The court DENIES those motions as moot. (Dkt. No. 104 as to ADA claims; Dkt. No. 108 as to Supplemental Disclosure of Expert Testimony; Dkt. No. 109 as to Motion to Amend.)

## SUNBELT'S MOTION

### I. Legal Standard on Motion to Reconsider

Sunbelt's motion to reconsider the court's October 2016 decision is brought under Fed. R. Civ. P. 54(b):

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

*Id.* Sunbelt's motion was filed within ten days of the court's decision. Whether it is properly analyzed under Rule 59(e) or Rule 54(b) does not change the standard required to modify the court's prior order, because Rule 54(b), like Rule 59(e), requires a showing of "substantially different, new evidence," "subsequent, contradictory controlling authority," or that "the original order is clearly erroneous." *Arnett v. Howard*, 2:13-cv-591 TS, 2014 U.S. Dist. LEXIS 101770 (D. Utah Jul. 16, 2014). The court has considered Sunbelt's arguments and authority and

concludes that its October 2016 ruling misapprehended the controlling law, and that its original decision dismissing all of Balding's FLMA and ADA claims on summary judgment was correct.

## II. Pretext Analysis on FMLA and ADA Claims

In its ruling on Balding's first motion to reconsider, the court reviewed the facts presented by both parties and analyzed whether a jury could reasonably infer that Sunbelt's explanation for firing Balding based on his dishonesty and poor performance was a pretext for firing him because of his request for FMLA leave. Based on the court's review of *Olson v. Penske Logistics, LLC*, No. 15-1380, 2016 U.S. App. LEXIS 15780 (10th Cir. Aug. 26, 2016), the court concluded that there were four facts that may support the inference of pretext: (1) that Sunbelt had knowledge of a number of Balding's medical issues prior to November 26, 2013; (2) that Sunbelt made the decision to terminate Balding the very same day it learned of the alleged misrepresentation to Weatherford, knowing he was on leave and without a meaningful investigation to verify Balding's explanation; (3) that senior management had previously agreed that Balding may have to be terminated at the first of the year, again being fully aware at the time that his medical issues may require FMLA leave; and (4) that management was at least on notice that the customer may not have fully disclosed that it had only sent in the hard copy purchase order on November 26, 2013, while back dating the order to November 5, perhaps to cover its representative's own lack of diligence.

Of those four reasons, the one that carried the most weight and influenced the court's consideration of the other reasons was the length and quality of Sunbelt's investigation into Balding's alleged misconduct prior to terminating his employment. Nevertheless, the court now re-examines each of these four facts to determine whether controlling law provides support for the conclusion that they may allow a factfinder to infer pretext. Notwithstanding that the court is

required to view the facts in the light most favorable to Balding, it remains Balding's burden to rebut Sunbelt's assertion that his misconduct and poor performance were the motivating factors for its decision to terminate his employment. *Estate of Bassatt v. Sch. Dist. No. 1*, 775 F.3d 1233, 1239 (10th Cir. 2014) ("Although it is generally true that the moving party has the burden to show that there is no genuine issue of material fact on a motion for summary judgment, the same is not true in the context of an adverse employment decision. When an employment decision is made based on alleged misconduct, the plaintiff must present evidence that rebuts the defendant's claim that the misconduct was the motivating factor for the employment decision.")

The court begins with Sunbelt's knowledge that Balding had reported medical issues over the years, including the "panic attack" that led to his taking leave in November 2013. A prime facie case of retaliation requires the plaintiff to show that "a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Balding has shown—and Sunbelt has not disputed— that Sunbelt was aware of Balding's reports of various medical issues and concerns. Additionally, there was close temporal proximity between Balding's November 21, 2013 request for time off following his "panic attack" and Sunbelt's termination of him on November 26, 2013. These facts are sufficient to show a "causal connection" between a protected activity and an adverse action and thus sufficient to state a prima facie case of retaliation. Beyond the possibility of a causal link, however, neither temporal proximity nor an employer's knowledge of protected activity are sufficient alone to establish pretext. Once Sunbelt met its burden of articulating a legitimate, nondiscriminatory reason for taking an adverse action, Balding was required to go beyond his prima facie case and produce evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Sunbelt's explanation sufficient to allow a

11

reasonable factfinder to find Sunbelt's reasons for firing Balding "unworthy of credence." *E.E.O.C. v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 490 (10th Cir. 2006). Accordingly, to the extent Balding failed to make such a showing, the court concludes that it was error to rely on temporal proximity or Sunbelt's knowledge or awareness of Balding's alleged medical concerns to support an inference of pretext.

The second, and most critical, fact in the court's prior reconsideration analysis is Sunbelt's termination of Balding within hours of when his dishonesty and misconduct were discovered without first conducting a "meaningful investigation." When the court originally granted summary judgment to Sunbelt, it had not sufficiently focused on the quality or extent of Sunbelt's investigation of Balding's misconduct or Balding's explanations about why his actions were not dishonest. Instead, the court attempted to follow the guidance of *Lobato v. New Mexico*, 733 F.3d 1283, 1289 (10th Cir. 2013), which states that "[i]n determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision, not the plaintiff's subjective evaluation of the situation." *Id.* Thus, the court examined (1) whether it was fair for Kowalski, Jr. to evaluate Balding's assertion that an order was "in process" by the usual practices and custom of the company rather than by Balding's idiosyncratic definition, (*Hr'g Tr.* 87; Dkt. No. 86), (2) whether it was reasonable for Sunbelt to believe from the face of the purchase order that Balding had received it on November 5 but not entered it prior to making his representations to the customer, even though Balding claimed to have only received it that day—and was later shown to be correct about that, (*Id.* at 88), and (3) whether Kowalski, Jr. honestly believed that Balding was lying after asking Balding for his version of events. (*Id.* at 89.)

In its first reconsideration analysis of these facts, the court took great pains to determine whether this analysis had mistakenly failed to view the facts in the light most favorable to Balding. The court recognized that "Sunbelt has presented a strong case that it had good cause to terminate Balding for poor performance and dishonesty." The court concluded, however, that the evidence of pretext may be sufficient to infer the real reason was Balding's health issues, even though the support was weak. (*Mem. Dec.* 13; Dkt. No. 103.) Upon further analysis the court concludes this was error.

The court now concludes that it misapprehended *Olson* and did not give sufficient attention to the more robust body of pretext precedent in the Tenth Circuit. *Olson* does not stand for the principle that an employer must conduct a thorough investigation to rebut an allegation of pretext. In fact, in *Olson*, the plaintiff struggled even to make a prima facie showing that his firing was causally connected to his leave, objecting that he was never given an opportunity to defend himself or tell his side of the story, something Balding was given here. *See Olson*, 2016 U.S. App. LEXIS 15780. Similarly, the court's reliance on *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 541 (10th Cir. 2014) for the principle that "[a] failure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext" failed to consider that the decision makers in *Smothers* never gave the employee an opportunity to tell his side of the story, and thus make a fair determination that his version of events was more or less credible than was the version reported by coworkers. *See also Dewitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1315 (10th Cir. 2017) (upholding dismissal of discrimination and retaliation claims and distinguishing *Smothers* because Dewitt was given an opportunity to tell her side of the story). By contrast, here Balding was given an opportunity to present his version of events to Kowalski, Jr. and Todd Perrin. They found his

explanation lacking credibility. (*See MK Jr. Decl.* ¶ 15; Dkt. No. 61 and *TP Decl.* ¶ 6; Dkt. No. 64.) "[U]nder [Tenth Circuit] precedent, simply asking an employee for his version of events may defeat the inference that an employment decision was . . . discriminatory." *E.E.O.C.*, 450 F.3d at 488. The court erred by focusing on whether a factfinder may believe Balding's reported version of events, supported by the thinnest of threads of inference, not on the relevant inquiry of whether Balding has shown that *Sunbelt did not genuinely believe* that Balding's explanation lacked credibility. *See Lobato*, 733 F.3d at 1289 ("[T]he relevant inquiry is not whether the employer's proffered reasons were wise, fair, or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs.")

Focusing on the correct inquiry, the court cannot conclude that Balding has presented sufficient evidence that Sunbelt did not genuinely believe that Balding had engaged in the dishonesty and misconduct alleged. For example, he presented no evidence of a pattern supporting a prior practice by himself or other employees of "reserving" or "pulling out" steel bars by calling the warehouse, or that he or other employees could get an order "in process" without a purchase order or without entering it into Sunbelt's system. In fact, Balding admitted that when he represented to Weatherford that its order was "in process," he needed more information than a purchase order number "to get an order in process." (*Mem. Dec.* 13; Dkt. No. 103.) This admission affirms Sunbelt's genuine belief that Balding's explanation was not credible. And while Sunbelt could conceivably have called the warehouse or Mr. Melvin Watson to conduct a more thorough investigation of Balding's explanation, "[t]he proper inquiry is not whether the inadequacy of the investigation foreclosed [Sunbelt] from the possibility of believing [Balding]. Rather, the relevant inquiry is whether [Sunbelt] subjectively, but honestly, believed that [Balding] had engaged in misconduct." *Estate of Bassatt*, 775 F.3d at 1240-41. The court

14

also notes that Balding failed to rebut Todd Perrin's testimony that Balding's explanation would have "been highly irregular" and made no sense. (*TP Decl.* ¶ 8; Dkt. No. 64.) ("Without at least an open order in Sunbelt's computer system, there would have been no way for anyone to process the order.")

In addition to Balding's failure to adequately challenge the genuineness of Sunbelt's belief that his explanations for the misconduct lacked credibility, under Tenth Circuit precedent, an attack on the adequacy of the investigation as a means of showing pretext—even when an employer fails to get the plaintiff's side of the story, as in *Smothers*—requires plaintiff to present evidence of a "disturbing procedural irregularity" that is "often exemplified by an employer's 'falsifying or manipulating of relevant criteria.'" *Cooper v. Wal-Mart Stores, Inc.*, 296 Fed. Appx. 686, 2008 WL 4597226, **10 (10th Cir. Oct. 6, 2008). In *Cooper*, Wal-Mart's failure to "follow its normal investigative practice of seeking out the employee's side of the story was insufficient to suggest that its reasons for terminating the plaintiff were false." *Id.* Likewise, in *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108 (10th Cir. 2007), an employer terminated an employee without interviewing her about a customer complaint. The Tenth Circuit noted that while "allowing [the plaintiff] to complete her side of the story would seem to be the most fair way of addressing the situation, we cannot say that [her supervisor's] failure to do so in these circumstances constitutes a 'disturbing procedural irregularity' sufficient to prove pretext." *Id.* at 1119. The Tenth Circuit went on to caution that it is not the court's role to "act as a super-personnel department" and decide in the employer's stead whether certain infractions warrant summary termination. *Id.*

Finally, in *Estate of Daramola v. Coastal Mart, Inc.*, 170 Fed. Appx. 536 (10th Cir. 2006), the employer's "lack of thoroughness" in investigating an employee's misconduct was

15

"not sufficient evidence of pretext to undermine the district court's grant of summary judgment." *Id.* at 544. Notwithstanding that the court found "little doubt" that the employer, Coastal Mart, "could have been more thorough in its pre-discharge investigation, consulting in-store videotapes and bank records and interviewing employees of Mr. Daramola's store," Mr. Daramola failed to provide evidence that Coastal Mart did not "honestly believe" the reasons it gave for terminating his employment. *Id.* Even if the employer's reasons are "poorly founded" but "honestly described," a plaintiff has failed to show pretext unless he or she successfully challenges the genuineness of the employer's belief in the misconduct. *Id.*

Thus, the court concludes that even viewing the facts in the light most favorable to Balding, Balding has failed to meet his burden "to show that the employer's proffered honest belief is in fact nothing more than a pretext for discrimination." *DeWitt*, 845 F.3d at 1313. Sunbelt sought Balding's response to the allegations of his misconduct. It did not find his explanations credible. In the absence of evidence from Balding that Sunbelt did not genuinely believe his explanations lacked credibility, the court cannot conclude that Sunbelt's failure to conduct further investigation into his explanation amounts to a "disturbing procedural irregularity" sufficient to support an inference of pretext.

The court now considers the third fact it previously found may support an inference of pretext: that senior management had previously agreed that Balding may have to be terminated at the first of the year, again being fully aware at the time that his medical issues may require FMLA leave. As discussed above, *see supra* p. 11-12, management's knowledge alone of Balding's reported medical issues cannot support an inference of pretext, although the court has already determined that such knowledge supports Balding's prima facie case. *Argo*, 453 F.3d at 1202. But once the court eliminates management's knowledge of Balding's reported medical

issues as the primary support for Balding's pretext claim, the question becomes whether management's discussions about potentially terminating Balding's employment at the first of the year sufficiently supports the inference of pretext.[4] The court concludes that even viewed in the light most favorable to Balding, it does not.

The record reveals numerous deficiencies in Balding's communications with customers, co-workers, and supervisors; poor sales performance; delayed delivery dates on customer orders that resulted in demands for management to reassign customer accounts to other sales representatives, and wrong shipments of materials that resulted in demands to be assigned a different salesperson. (*MK Jr. Decl.* 2-4; Dkt. No. 61.) While Balding claims he disputed one formal Warning Notice he received, (*see id.* at Ex. 61-1 p. 2), he does not dispute that such issues warranted management concern. (*Balding Depo.* 131:1-6, 132:16-20, 151:20-152:24.) Prior to the incident with Weatherford, Sunbelt acknowledges that it had considered placing Balding on a "90-day Performance Improvement Plan (PIP)" once he returned from taking some time off. (*MK Jr. Decl.* 2-4; Dkt. No. 61.) The Weatherford incident, however, persuaded Balding's supervisor that "Balding had removed himself as a PIP candidate and could not be trusted to communicate with customers." (*Id.* at 6.) Balding has failed to rebut this evidence with anything to show that Sunbelt's belief in Balding's dishonesty about his communications with Weatherford was insincere. He has failed to show that others were treated more leniently than he

---

[4] Management's discussions about termination come from notes from Sunbelt's Human Resources Manager, Nancy Pickering, where she documents a meeting with Kowalski, Sr. and Rutledge to discuss Balding's performance issues. She wrote:

> Met with Mike Sr. and Kathy regarding the situation. I related to them what has transpired this week. We were all in agreement that [Balding] is not being asked to do more than any other salesman and that the continued write-ups all revolve around the same issues. My comment to Mike and Kathy was that, unfortunately, the situation with [Balding] did not seem to be getting resolved. I advised them of his apparent worsening financial position (employment verifications from loan companies). Kathy offered to contact [Balding]. We are all in agreement that after the first of the year, we may have to proceed with termination.

(*Balding's Appx.,* Ex. O; Dkt. No. 75-15.)

was for similar conduct. Most importantly, he has failed to present evidence that his leave status—rather than performance issues and dishonesty—was a factor in Sunbelt's termination decision.[5]

Finally, the court considers the fact that at the time it terminated Balding, management was on notice that Weatherford may not have fully disclosed that it had only sent in the hard copy purchase order on November 26, 2013, while back dating the order to November 5, perhaps to cover its representative's own lack of diligence. Tenth Circuit precedent states that "[w]e have repeatedly held that the relevant inquiry in such cases concerns the belief of the employer that the employee engaged in misconduct, not whether the actual facts, as shown by evidence extrinsic to the employer's assessment, may have been otherwise." *Sorbo v. United Parcel Services*, 432 F.3d 1169, 1178 (2005). Where Balding has failed to produce evidence that Sunbelt did not genuinely believe at the time of his termination that Balding had received a hardcopy of the purchase order before November 26, it is irrelevant that it was later shown that Balding did not receive it until the day he was terminated. Furthermore, even if Sunbelt had known that Balding did not receive the purchase order on November 5, 2013, Balding has failed to rebut the testimony of Michael Kowalski, Jr. that such knowledge "would not have changed my recommendation that his employment be terminated . . . . Whether he had a purchase order or not, the point is that he hadn't entered any order on November 21, 2013, when he misrepresented to [Weatherford] that the order was 'in process.'" (*MK Jr. Decl*. 6; Dkt. No. 61.)

Therefore, on reconsideration of the controlling Tenth Circuit law and the facts of this case, viewing the facts in the light most favorable to Balding but requiring him to bear the

---

[5] The record reflects, instead, that Sunbelt worked with Balding's medical complaints and time off requests for years without complaint. In *Smothers*, by contrast, the record reflected that "managers and coworkers complained about his FMLA-protected absences," considered forcing him to change his shifts to make it easier to deal with his absences, and gave him negative performance evaluations "because of his absenteeism." *Smothers*, 740 F.3d at 534.

burden of rebutting Sunbelt's nondiscriminatory explanation for its termination decision, the court concludes that its original order granting summary judgment to defendants was proper. The court GRANTS Sunbelt's motion for reconsideration. (Dkt. No. 105.) As a result, the court denies as MOOT Sunbelt's motion as to certain claimed damages and its motion to exclude non-retained expert testimony. (Dkt. No. 53, § V.E. and Dkt. No. 65.)

## CONCLUSION

For the reasons stated above, the court DENIES Balding's motion to reconsider his contract and quantum meruit claims (Dkt. No. 104), denies as MOOT Balding's motion to reconsider his ADA discrimination and failure to accommodate claims (Dkt. No. 104), and denies as MOOT his motions to admit Dr. Allred's Declaration and Supplemental Expert Disclosure. (Dkt. No. 108 as to Supplemental Disclosure of Expert Testimony; Dkt. No. 109 as to Motion to Amend.) The court GRANTS Sunbelt's motion to reconsider Balding's FMLA interference and retaliation claims and his ADA retaliation claim, (Dkt. No. 105), and denies as MOOT Sunbelt's motion as to certain claimed damages and its motion to exclude non-retained expert testimony. (Dkt. No. 53, § V.E. and Dkt. No. 65.) Balding's claims are dismissed, and this decision resolves all pending issues before the court. This matter is now ripe for Balding's appeal. *See* Dkt. No. 123.

DATED this 21st day of April, 2017.

BY THE COURT:

_____
CLARK WADDOUPS
United States District Court Judge